IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SHERRY L. GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | Civil Action No.: 1:04CV01149 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Sherry L. Gray, brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Social Security Act (the "Act").[1]  The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

## Procedural History

Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income on July 31, 2002 (protective filing date), alleging a disability onset

---

[1]  The Social Security Disability Insurance Program was established by Title II of the Act, 49 Stat. 622 (codified at 42 U.S.C. § 401 et seq.), and the Supplemental Security Income Program was established by Title XVI of the Act, 86 Stat. 1465 (codified at 42 U.S.C. § 1381 et seq.).

date of June 5, 2002. Tr. 81, 363. The applications were denied initially and upon reconsideration. Tr. 51-52; 366, 372. Plaintiff requested a hearing de novo before an Administrative Law Judge (ALJ). Tr. 66. Present at the hearing, held on June 23, 2004, were Plaintiff and her attorney. Tr. 30.

By decision dated July 2, 2004, the ALJ determined that Plaintiff was not disabled within the meaning of the Act. Tr. 17. On November 16, 2004, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 7), thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3.    The claimant's lumbar degenerative disc disease at L4 to S1 with Grade 1 approaching Grade II spondylolisthesis, status post bilateral decompression with pedicle screws and bone fusion; history of ventral hernia; depression and anxiety are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b)[sic].
>
> 4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: light level work with occasional stooping, crouching and twisting. With respect to her non-exertional (mental) limitations, the undersigned agrees with the DDS that the claimant is capable of understanding and remembering simple instructions; she can sustain concentration sufficient to perform a variety of tasks at a non-rapid to semi-rapid pace; she can relate appropriately with supervisors and co-workers and can adapt to routine changes in the workplace associated with simple tasks.

7. The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from semi-skilled work previously performed (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform substantially all of the full range of light work (20 CFR §§ 404.1567 and 416.967).

12. Based on an exertional capacity for light work, and the claimant's age, education, and work experience, Medical-Vocational Rule 202.21, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

13. The claimant's capacity for light work is substantially intact and has not been compromised by any nonexertional limitations. Accordingly, using the above-cited rule as a framework for decision-making, the claimant is not disabled.

3

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

Tr. 28-29.

## Analysis

In her brief before the court, Plaintiff argues the Commissioner's findings are in error because the ALJ improperly (1) weighed her treating physicians' opinions; (2) assessed her credibility; and (3) failed to consider that she was disabled for a "closed period." The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

## Scope of Review

The Act provides that, for "eligible"[2] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).[3]

---

[2] Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C. § 1382(a).

[3] The regulations applying these sections are contained in different parts of the Code of Federal Regulations (C.F.R.). Part 404 applies to federal old-age, survivors, and disability insurance, and Part 416 applies to supplemental security income for the aged, blind, and disabled. Since the relevant portions of the two sets of regulations, for purposes herein, are identical, the citations in this report will be limited to those found in Part 404.

4

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration (the "SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents her from doing any other work. 20 C.F.R. § 404.1520.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir.1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Pertinent Evidence Presented

As of the date of the ALJ's decision, Plaintiff was forty years of age. Tr. 18. The ALJ found that she has a tenth grade education and past relevant work (PRW) as a cashier, nurse's aid, clerical worker, and salesperson. According to the ALJ, Plaintiff initially alleged disability due to a stomach tumor, cysts on her kidneys and ovaries, anxiety, depression, neck pain, and constant leg pain.

The ALJ found that Plaintiff had not engaged in substantial gainful activity (SGA) since her alleged onset of disability (AOD). She also determined that Plaintiff met the disability insured status requirements of the Act through the date of her decision. Further, the ALJ found the medical evidence to establish that Plaintiff suffered from the severe impairments of lumbar degenerative disc disease at L4 to S1 with Grade 1 approaching Grade II spondylolisthesis, status post bilateral decompression with pedicle screws and bone fusion; history of ventral hernia;

6

depression and anxiety. She concluded, nevertheless, that none of these impairments met or equaled any of the Listing of Impairments.

1. Treating Physicians' Opinions

Plaintiff claims the ALJ erred in her evaluations of the opinions of two physicians who treated her.[4] "'Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight.'" Mastro v. Apfel, 270 F.3d 174, 178 (4th Cir. 2001) (quoting Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)). Rather, a treating physician's opinion is evaluated and weighed "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). In the

---

[4]  While the analysis in the text applies to "treating physicians," the court questions whether either Dr. Mason or Dr. Fullerton could be characterized as such at the time they rendered their opinions. According to the transcript, neither doctor had treated Plaintiff more than twice before offering a disability opinion. SSA regulations provide for the Commissioner to give more weight to the opinion of a treating physician because that physician is most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d)(2). See also Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983) (according "great weight" to the opinion of a claimant's treating physician "for it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.").

face of "persuasive contrary evidence," the ALJ has the discretion to accord less than controlling weight to such opinion. Mastro, 270 F.3d at 178.

Plaintiff first complains of the ALJ's assessment of Dr. William Mason's opinion. Dr. Mason, an orthopaedist, completed a questionnaire on March 13, 2003, some nine months after Plaintiff's AOD. He diagnosed Plaintiff with low back pain and spondylolisthesis, and stated that she could not "lift, bend, stoop, crawl, etc." Tr. 202. According to Dr. Mason, Plaintiff was permanently unable to return to her PRW or even to engage in work training. He also, however, wrote that he was going to refer Plaintiff to a neurosurgeon for possible lumbar surgery.

In addressing Dr. Mason's disability opinion, the ALJ stated:

[T]his opinion is not supported by any medically determinable, clinical or diagnostic data and appears based on subjective complaints rather than objective medical evidence. Moreover, this opinion was rendered before the claimant had her back surgery on May 8, 2003 and did not take into account the outcome of her surgery. Also, his opinion is not consistent with the other substantial evidence of record. None of the other treating sources stated the claimant was totally and permanently disabled because of her back condition or any other impairment. Therefore, his opinion is not given controlling weight.

Tr. 23.

Plaintiff argues that there is data to support Dr. Mason's opinion. She notes the doctor read her magnetic resonance imaging ("MRI") to confirm "the spondylolyses[5] and changes at L5-S1, although a definite herniated disc was [not]

---

[5] Stedman's Medical Dictionary (5th ed. 2000) defines "spondylolysis" as "[d]egeneration or deficient development of a portion of the vertebra; commonly involves (continued...)

seen.  She has had a moderate bilateral foraminal stenosis."  Tr. 209 (footnote

added).  Plaintiff adds that, less than two months after Dr. Mason's questionnaire,

she underwent fusion surgery.  <u>See</u> Tr. 225.  She further complains that the ALJ

failed to articulate the alleged inconsistencies between Dr. Mason's opinion and the

record.

The court initially notes that, aside from Dr. Mason's interpretation of the MRI,[6]

his medical records contain no other data besides Plaintiff's subjective complaints

of pain;  there are no examination findings.  <u>See</u> Tr. 208-09.  Also, Dr. Mason

diagnoses spondylolyses (a forerunner to spondylolisthesis) "changes" at only one

level, no herniation at all, and only moderate stenosis.  The whole of his March 13,

2003, record reads:

> She is still having a lot of trouble sleeping at nighttime.  Dr.
> Shannon did try an epidural, although, he felt it probably was not going
> to give her any relief, and in fact it has not.
>
> I think it is still wise to try the epidural block to try and attempt to
> get somebody [sic] relief and try to avoid a neurosurgical consultation
> and possible operation.  I think at this time since she is not better and
> cannot sleep we will send her to a neurosurgeon to see if they feel she
> is a surgical candidate.

---

[5]   (...continued)
the pars interarticularis, which can result in a spondylolisthesis."  <u>Id.</u> at 1678.

[6]   One caregiver characterized these MRI findings as showing "pretty good alignment
and [discs other than L5 and S1] were well preserved.  There was no destructive or
traumatic changes to the bone.  Spinal cord looked normal.  ...  There was no evidence of
herniation."  Tr. 217.

Tr. 208.  Clearly, Dr. Mason's records contain little support for his determination that Plaintiff is permanently precluded from SGA.

As to inconsistent records, the ALJ noted, Tr. 19, that during Plaintiff's consultative examination ("CE") in September 2002, she could stand four to five hours before her pain worsened, see Tr. 228.  Plaintiff had negative straight leg raising ("SLR") and good range of motion ("ROM") of all her joints, including her low back.[7]  Tr. 229.  During a psychological CE a few days later, Plaintiff "ambulated with no impairment."  Tr. 22 (citing Tr. 183).

Dr. Saijal Gupta treated Plaintiff on several occasions prior to Dr. Mason's opinion.  The ALJ noted that, on December 9, 2002, despite her complaints, Plaintiff had full ROM of her back, normal SLR, and a normal gait.  Tr. 21 (citing Tr. 193).

In addition to the above specifics, the record as a whole fails to support Dr. Mason's disability opinion.  Plaintiff placed her AOD as of June 5, 2002, yet apparently did not seek treatment until June 14.  See Tr. 154-61.  She has records of several medical visits thereafter, yet did not seek treatment primarily for back pain until consulting Dr. Mason.[8]

---

[7]  The ALJ noted observation of a limp during Plaintiff's CE, Tr. 19, but the examiner actually stated *twice* that Plaintiff "does not have a limp," Tr. 229.

[8]  During a July 15, 2002, emergency room visit for complaints of diarrhea and vomiting, it was noted that Plaintiff had back and flank pain.  Tr. 146.  At a "follow-up of depression and anxiety" on July 23, 2002, she mentioned "occasionally having some intermittent back pain."  Tr. 135.

Plaintiff's next complaint was not until December 9, 2002, when Dr. Gupta recorded, "[S]he kind of hurt her back at work and since then she has had this on and off symptoms. She does not have any numbness or tingling down her legs. She said it has mostly been after she has been on her legs and feet for a long time." Tr. 193. As noted above, Dr. Gupta found Plaintiff had full ROM of her back, normal SLR, and a normal gait. He thought she simply had musculoskeletal back pain and prescribed Anaprox twice a day for seven days, then as needed. When no better on her next visit, Dr. Gupta agreed that Plaintiff should get orthopaedic input. It is clear from this review that, at the time Plaintiff saw Dr. Mason, there was little support for a disabling condition.

Plaintiff next objects to the ALJ's statement that Dr. Mason did not consider the outcome of her surgery. She contends "the medical evidence" following her surgery only bolsters Dr. Mason's opinion. Pl.'s Br. at 6. Plaintiff first refers to her complaints of "unremitting back pain," id., yet this is not objective, but rather, subjective evidence. Plaintiff did take powerful narcotics,[9] but there is some evidence that she engaged in "medication seeking behavior," as mentioned by the ALJ. Tr. 25; see also Tr. 285.

As to objective findings, Plaintiff overstates her case. Upon discharge, her surgeon, Dr. Ranjan Roy, found that she was slow in ambulating, but maneuvered quite well. Tr. 223. One month later, she still had "some" back pain, but her leg pain

---

[9]    See discussion at pages 19-22, infra.

was better.  Tr. 233.  She had been doing housework.  Her SLR was negative and the motor strength in her lower extremities was five of five.

An MRI on July 29, 2003, revealed no recurrent herniated nucleus pulposus, central spinal canal, or neural foraminal stenosis.  Tr. 164.  Although Plaintiff still had spondylolisthesis at L5-S1, it was determined to be mild Grade I, only.  As she recounts, at her next visit in September, Plaintiff's spinal ROM was found to be severely limited, but her SLR was still negative, and her caregiver opined that her mental health "played a huge part in the slow progression of her recovery."  Tr. 232. Plaintiff agreed.  Two weeks later, she told Dr. Gupta that her pain was "well controlled."  Tr. 187.

Plaintiff did not return to Dr. Roy until February 2004, for a routine visit.  See Tr. 285.  He found her to be neurologically unchanged but, because of her pain complaints, ordered another MRI.  Plaintiff notes the findings of "'1 cm anterior subluxation of L5 on S1'" and "'significant chronic degenerative L5/S1 disc space flattening,'" Pl.'s Br. at 6 (quoting Tr. 303), but disregards the diagnostic discussion. The radiologist concluded that a "[p]osterior L5/S1 disc bulge, in combination with anterolisthesis, results in *mild-moderate* right foraminal stenosis, *mild* left foraminal stenosis, and *without significant thecal sac impression or significant spinal stenosis.* No other significant lumbar disc bulge occurs."  Tr. 303 (emphases added).

Lastly, Plaintiff takes issue with the ALJ's observation that no other treating source concluded that she was "totally and permanently disabled."  Plaintiff claims

12

that this is "factually incorrect," as her "pain management doctor" opined that she was disabled "nearly a year *after*" her surgery. Pl.'s Br. at 6-7. Finally, she notes that the ALJ failed to indicate the weight she gave this doctor's opinion.

Plaintiff first consulted Dr. Heather Fullerton on March 4, 2004. See Tr. 353. With regard to her back pain, between her May 8, 2003, surgery and this visit, she had only the above-mentioned routine visits with Dr. Roy's practice, and two emergency room visits.[10]

Upon examination, Dr. Fullerton observed that Plaintiff's ROM was full for flexion, extension, and lateral bending, given the limitation of her fusion. Tr. 353. Plaintiff exhibited no lumbar instability, and had negative SLR bilaterally; five of five strength; normal tone in her lower extremities and lumbar paraspinals; reflexes that were two-plus and equal; light touch sensation intact through her lower extremities; intact pedal pulses; and no gait abnormalities. Dr. Fullerton read Plaintiff's February 23, 2004, MRI to show only mild right-sided foraminal stenosis at L5-S1. She noted that Plaintiff had undergone neither physical therapy nor chiropractic treatment. Tr. 353. The doctor prescribed methadone for Plaintiff's pain, the muscle relaxant Baclofen, and physical therapy. Tr. 354.

Plaintiff returned to Dr. Fullerton on March 31, 2004, complaining her pain was even worse. Tr. 346. Yet her benign objective findings remained the same, and the

---

[10] The second such visit occurred three days after Plaintiff was involved in a motor vehicle collision, and she left shortly after checking in. See Tr. 314-15.

doctor noted that she had used a tanning bed.  Dr. Fullerton increased Plaintiff's

medication dosage and again prescribed physical therapy.  Tr. 347.  A record dated

April 2, 2004, shows Plaintiff did not attend a physical therapy evaluation that had

been scheduled on three occasions.  Tr. 344.  On April 20, Dr. Fullerton completed

a questionnaire similar to that submitted by Dr. Mason.  See Tr. 360.  She, however,

listed Plaintiff's only "limitation to employment" as pain, and opined that Plaintiff

would be able to return to her previous type of  work[11] in six months.[12]  Id.

Clearly, Dr. Fullerton's questionnaire does not support Dr. Mason's opinion,

as she does not agree Plaintiff will be "totally and permanently disabled."  Further,

as Plaintiff points out, Dr. Fullerton's opinion was rendered almost a year after

Plaintiff's surgery, and over a year after Dr. Mason's opinion.  As discussed above,

the objective findings after Plaintiff's surgery fail to support a disabling condition.

Also, Plaintiff sought minimal help for her back pain between her surgery and Dr.

Fullerton's care, although her record shows multiple healthcare visits.  Moreover, the

---

[11]  Plaintiff had reported to Dr. Fullerton that she had "worked as a secretary until 2 years ago," Tr. 353, although her SSA-related paperwork and testimony indicate otherwise, see, e.g., Tr. 38, 96, 105, 127; see also Tr. 141 (showing "Place of Business" as "Faith Shoes"), 180, 217.  Interestingly, in answer to the question, "Why do you think [your pain] started," Plaintiff answered, "Don't know," although she was provided the choice of injury at work.  Tr. 350.  On several occasions, Plaintiff indicated she stopped working after an on-the-job injury.  See, e.g., Tr. 38, 127, 158, 183, 193, 217.

[12]  Dr. Fullerton added that Plaintiff's capacity for work or work training would be improved by surgical evaluation and *physical therapy.*  Cf. Hunter v. Sullivan, 993 F.2d 31, 36 (4th Cir. 1992) (claimant's failure, inter alia, to follow medical and physical therapy regimen supported ALJ's inference that claimant's pain was not as severe as he asserted); 20 C.F.R. § 404.1530(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.").

14

treatment prescribed on those few occasions – medication only – indicates that her caregivers failed to find the severity Plaintiff alleges.

Plaintiff even told Dr. Fullerton that Dr. Roy would not consider additional surgery. Tr. 346. Prior to her visit with Dr. Fullerton, Plaintiff's medical records do not contain complaints of the degree of severity and limitation that she alleges to this doctor.[13] Accordingly, the court finds little support for Dr. Mason's opinion in Dr. Fullerton's assessment.

As to the ALJ's failure to evaluate Dr. Fullerton's opinion, there was no such need. Dr. Fullerton opined that Plaintiff would be unable to work for six months. She did not add that Plaintiff was unable to engage in SGA during the preceding six months. A disabling impairment must have lasted, or be expected to last, for a period of twelve months in order to qualify a claimant for disability benefits. See 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).

Moreover, "medical opinions" are statements "that reflect judgments about the nature and severity of your impairment(s), . . . what you can still do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Dr. Fullerton listed no specific limitations or restrictions and, to the extent she determined Plaintiff was unable to engage in SGA, that opinion was irrelevant, as it addressed only a six-month period. Accordingly, the court finds no error.

---

[13] Plaintiff does tell Dr. Fullerton that her motor vehicle accident worsened her pain, Tr. 353; perhaps this is why, but there remained no objective findings to support a disabling condition.

15

Finally, the ALJ correctly noted that "the ultimate determination/decision of whether or not an individual is or is not disabled . . . is reserved to the Commissioner to decide." Tr. 23 (citing Social Security Ruling 96-5p, 61 Fed. Reg. 34471). The regulations specifically provide that the Commissioner "will not give any special significance to the source of an opinion on issues" so reserved. 20 C.F.R. § 404.1527(e)(2). To the extent the doctors opined as to Plaintiff's disability status, their opinions were not entitled to controlling weight.

## 2. Credibility

Plaintiff complains about the ALJ's assessment of her credibility. The ALJ is required to make credibility determinations about allegations of pain or other nonexertional disabilities. See Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985). Subjective complaints of pain are evaluated in two steps. First, the record must provide objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b); see also Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). Craig makes clear that the regulations require the underlying impairment be one "which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. . . . [T]he actual pain, in the amount and degree, alleged by the claimant."

16

Id. at 594. See also Johnson v. Barnhart, 434 F.3d 650, 657 (4th Cir. 2005) (quoting Craig).

After a claimant meets this initial threshold, the second step is consideration of the entire record, including objective and subjective evidence, to assess the credibility of the severity of the subjective complaints. See id. at 591-96; see also Mickles v. Shalala, 29 F.3d 918, 922-30 (4th Cir. 1994). The fact-finder must evaluate the intensity and persistence of the claimant's pain and the extent to which it affects his ability to work. Craig, 76 F.3d at 595; see also 20 C.F.R. § 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also the other available evidence, including the claimant's medical history, medical signs, laboratory findings, any objective medical evidence of pain, and any other evidence relevant to the severity of the impairment, such as evidence of daily activities, specific descriptions of the pain, and medical treatment taken to alleviate it. Craig, 76 F.3d at 595. An ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).

The ALJ's credibility discussion is quite lengthy and thorough. Plaintiff disputes the ALJ's reliance on her lack of treatment both prior to and after surgery. Specifically, she notes that Plaintiff utilized neither a TENS unit nor chiropractic treatment. Plaintiff argues, "The ALJ may not impose medical treatment

17

requirements that [Plaintiff]'s own doctors did not see fit to prescribe and then use that as a basis for discounting her credibility."  Pl.'s Br. at 7.

The court agrees that Plaintiff cannot be held accountable for the treatment decisions of her caregivers.  There is a difference between failing to follow a caregiver's advice and not receiving such advice.  The Tenth Circuit case of Thompson v. Sullivan, 987 F.2d 1482  (10th Cir. 1993), is instructive:

> [B]efore the ALJ may rely on the claimant's failure to pursue treatment . . . as support for his determination of noncredibility, he or she should consider "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse."

Id. at 1490 (citation omitted).  Cf. 20 C.F.R. § 404.1530(a) ("In order to get benefits, you must follow treatment *prescribed* by your physician if this treatment can restore your ability to work." (emphasis added)).  As discussed above, however, Plaintiff's efforts to seek treatment for her back pain were minimal, especially considering her many visits for other ailments.  And, as noted in Craig, medical treatment undertaken to alleviate pain is a consideration in the credibility assessment.  76 F.3d at 595. See also Social Security Ruling 96-7p, 61 Fed. Reg. 34483,  34485 (citing 20 C.F.R. § 404.1529(c)(4)).

Plaintiff next disputes the ALJ's statement that Plaintiff never used a back brace, and the court again agrees.  See Tr. 188, 223, 232, 287.  But there is no evidence that Plaintiff needed to wear the brace as long as she did.  Dr. Roy placed

Plaintiff into the brace upon discharge from her surgery for a recommended six weeks. Tr. 223. When she returned for her initial follow-up, there is no indication she was still wearing the brace. See Tr. 233. At three months out, her x-ray showed a "[s]table appearance to the lumbar spine," and she was advised to stop wearing the brace. Tr. 287.

Plaintiff claims the ALJ incorrectly stated that she "did not take 'strong potent pain medication.'" Pl.'s Br. at 8; see Tr. 24. The record reflects that, with regard to her back pain, Plaintiff was initially prescribed Tylox, Tr. 153; provided samples of Skelaxin and Vioxx, Tr. 135; and given Anaprox, Tr. 193. There is no showing that these prescriptions were ongoing.

Dr. Gupta first prescribed Ultram for Plaintiff on December 16, 2002. See Tr. 192. Interestingly, there is no indication that Dr. Mason, who declared Plaintiff permanently disabled, prescribed *any* medication, see Tr. 208-09, although Plaintiff reported that he advised her to use Tylenol, Tr. 217. When she received her sole epidural steroid injection on February 27, 2003,[14] Plaintiff reported taking Tramadol. Tr. 218.

When Plaintiff returned to Dr. Gupta on March 17, 2003, he advised her to call Dr. Mason should she experience pain. Tr. 189. Thereafter, she consulted Dr. Roy, who advised her to wear an elastic binder and gave her a prescription for Soma.

---

[14]   At this visit, Plaintiff claimed to have had "multiple Emergency Room visits" because of her back pain, Tr. 217, but although the transcript contains several records from the hospital, those records do not support Plaintiff's statement.

19

Tr. 240.  There is no indication that Dr. Roy prescribed Plaintiff pain relievers until after her surgery.  <u>See</u> Tr. 234-40.  At that time, he issued Duragesic patches, Dilaudid, and Valium for muscle spasm.  Tr. 223.  When she returned for follow-up on June 25, 2003, she was no longer taking Valium, but continued with MS Contin, which Dr. Roy renewed.  Tr. 233.  At her next visit, three months later, she was again taking Valium, and both prescriptions were renewed.  Tr. 232.

Plaintiff next sought care for back pain after her December 2003 accident, but she did not receive any pain medication.  <u>See</u> Tr. 314-16.  When she returned to Dr. Roy on February 13, 2004, he noted, "There are discrepancies with regard to her pain medication, apparently, she has been getting it from other physicians in addition to getting it from us."  Tr. 285.  The record does not show that Dr. Roy issued further prescriptions.

With the exception of two emergency room visits (one for back pain, Tr. 295, and one for constipation, Tr. 299), the only medical records thereafter are from Dr. Fullerton.  She initially prescribed Baclofen, a muscle relaxant, and methadone for pain, explaining that methadone is a longer-acting medication than morphine. Tr. 354.  On May 10, the doctor renewed Plaintiff's Baclofen prescription but, due to side effects, replaced methadone with OxyContin.  Tr. 342.  When Plaintiff requested on May 26 that her medication be increased, Dr. Fullerton demurred, offering instead "a psychiatry referral to deal [with] depression/anxiety associated [with] her pain." Tr. 339.

These records lend support to Plaintiff's complaints of severe pain, not from her AOD, but rather, not until December 2002. Detracting from this support, however, are references to Plaintiff's possible abuse of these medications, to which the ALJ alluded. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (a disability claimant's misuse of medications is a valid factor in an ALJ's credibility determinations). Upon discharge, Dr. Roy prescribed Plaintiff, inter alia, Dilaudid. Tr. 223. The Physicians' Desk Reference (60th ed. 2006) [hereinafter, PDR], warns that Dilaudid is a Schedule II narcotic, can produce drug dependence of the morphine type, and therefore has the potential for being abused. Id. at 440. Dr. Roy continued Plaintiff on MS Contin, Tr. 232-33, which contains morphine sulfate.[15] PDR at 269.

In December 2003, when Plaintiff consulted with Dr. David Gimenez regarding abdominal discomfort (for which he found "no apparent mechanical etiology"), he refused to issue a prescription "[d]ue to her chronic narcotic use." Tr. 280. At her last record visit with Dr. Roy, he raised questions as to Plaintiff obtaining medication from other caregivers, and apparently declined to prescribe more. Tr. 285.

Plaintiff continued her narcotic usage with Dr. Fullerton, who prescribed methadone (hydrochloride) for pain, a synthetic narcotic drug "similar in action to

---

[15] Dr. Roy's physician's assistant commented that Plaintiff's medications were refilled "as she is going to lose her Medicaid at the end of this month and will be unable to fill these prescriptions after that." Tr. 232. There is no indication Plaintiff's Medicaid was discontinued. The following month, Dr. Gupta saw Plaintiff and issued two prescriptions. Tr. 187.

morphine but with slightly greater potency and longer duration," and sometimes used in replacement.  Stedman's Medical Dictionary 1103 (27th ed. 2000).  The doctor thereafter replaced the methadone with OxyContin, a Schedule II controlled substance.  PDR at 2699.  The PDR advises that, as "an opioid agonist of the morphine-type," OxyContin is "sought by drug abusers and people with addiction disorders and [is] subject to criminal diversion."  Id. at 2701.  When Plaintiff asked that her dosage be increased, Dr. Fullerton refused.  Tr. 339.

Moreover, the ALJ did *not* state that Plaintiff did not *take* strong medication, but rather that there was "no indication . . . she *needed* to take strong potent pain medication for pain relief *although she alleged otherwise.*"  Tr. 24 (emphases added).  The record supports this conclusion.  Clearly, under the Craig standard, Plaintiff's objective medical findings fail to substantiate an impairment which could reasonably be expected to cause the actual pain, in the amount and degree, that she alleged.  See Craig, 76 F.3d at 594.

Plaintiff also objects that the ALJ stated she did not experience side effects from her medications.  See Tr. 24.  During her hearing, Plaintiff testified that she was taking OxyContin, Banophen, hydrocodone, Klonopin, and Effexor.  Tr. 37.  She answered the ALJ that she did not experience any side effects.  Tr. 37-38.  After questioning by her attorney, however, she responded that Oxycontin made her lightheaded.  Tr. 46-47.  Still later, the following exchange took place:

22

Attorney:   Do you get drowsy when you take medication or have any other side effects beside lightheadedness?

Plaintiff:   Yes.  When I take the Effexor and the Clonopin[sic], I get drowsy.

Tr. 48.

Dr. Fullerton started Plaintiff on OxyContin on May 10, 2004, because Plaintiff "seem[ed] to be having some side effects" on methadone.  Tr. 342.  Plaintiff spoke with Dr. Fullerton's staff on both May 26 and 27, yet made no complaints of side effects.  See Tr. 339.

Plaintiff appears to have started taking Effexor as early as May 2002.  See Tr. 137.  Upon follow-up almost four weeks later, she had no complaints.  Tr. 136.  By July 23, 2002, Plaintiff had discontinued Effexor on her own, as she was "no longer tolerating" it.  Tr. 135.

Dr. Gupta started Plaintiff on Lexapro in November 2002, but after it made her sick, he changed the prescription to Effexor.  Tr. 195-97.  Upon follow-up on December 9, Plaintiff reported that she was "doing okay on it."  Tr. 193.  A month later, she told Dr. Gupta that she initially had some trouble, but "after awhile she was not having too many side effects. . . . [S]he is glad that she can find a medicine that she can tolerate."  Tr. 191.

By January 27, 2003, Plaintiff was "tolerating the Effexor well" and asked for an increased dose.  Tr. 190.  On March 17, Dr. Gupta increased the dosage to three times the initial amount, and added Klonopin to her medication regimen.  See

23

Tr. 189. On follow-up in June, Plaintiff reported that Effexor helped, and Klonopin "work[ed] pretty well for her." Tr. 188. She was "thankful" that she was on these medications, and Dr. Gupta observed she was "doing well" on them. Id. Nor is there a mention of side effects at Plaintiff's last record visit to Dr. Gupta, on October 8, 2003. See Tr. 187. Consequently, other than Plaintiff's testimony, there is no record evidence that these three medications caused the attested side effects. Cf. Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir.2002) ("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations."), quoted in Johnson, 434 F.3d at 658.

In addition to the ALJ's findings above being supported by substantial evidence, she relied on several additional factors. Plaintiff did not need to use an assistive device for ambulation. Tr. 24. She alleged she could sit only one hour, stand thirty minutes, walk one block, and lift only five pounds, but no treating source so opined. Tr. 25. Plaintiff testified she might undergo more surgery, Tr. 42, but there is no such indication in the record.

In addition, Plaintiff's exam findings fail to support her allegations of severe pain and resulting functional limitations. Upon exam, there was no tenderness to palpation over spinous processes or paraspinals; normal posture; full flexion, extension and lateral bending; no lumbar instability; five of five strength bilaterally; normal tone and sensation; two-plus reflexes bilaterally; and no gait abnormality.

24

Tr. 25 (citing Dr. Fullerton's exam, Tr. 341). During her CE, Plaintiff displayed no pain behaviors or gait disturbance.

Further, Plaintiff complained of mental health issues, but had not been hospitalized as a result or sought treatment by a mental health professional. See Tr. 183. She denied suicidal ideation or gestures, showed no significant attention or concentration deficits, and had good insight. See Tr. 184.

Finally, the ALJ noted that Plaintiff had not attempted to find suitable work on her own, or contacted Vocational Rehabilitation or another source for assistance in retraining or finding other work. Tr. 26. Overall, the court finds the ALJ's credibility analysis to be supported by substantial evidence. To the extent she may have committed any errors, the court determines that they are harmless. Cf. Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) (refusing to set aside a finding based on an "arguable deficiency in opinion-writing technique" when it was unlikely to have affected the outcome); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

3. Closed Period

Plaintiff claims the ALJ erred in failing to consider if she was entitled to a closed period of disability. "[I]n a closed period case, 'the decision-maker determines that a new applicant for disability benefits was disabled for a finite period

of time which started and stopped prior to the date of his decision.'"[16]   Waters v.
Barnhart, 276 F.3d 716, 719 (5th Cir. 2002) (quoting Pickett v. Bowen, 833 F.2d 288,
289 n. 1 (11th Cir. 1987)).   Clearly, Plaintiff's argument has no merit, as the ALJ
found she was not under a disability "at *any* time through the date of this decision."
Tr. 29 (emphasis added).

Plaintiff argues that she had a "condition" in June 2002 that ultimately required
surgical repair in May 2003 and a "reasonable period of convalescence thereafter."
Pl.'s Br. at 10.  As discussed hereinabove, however, there is no showing that in June
2002 Plaintiff's ailments were disabling.  Further, there is substantial evidence to
support the ALJ's finding that Plaintiff was not disabled even at the time of her May
2003 surgery or for a "reasonable period" (i.e., the durational period of twelve
continuous months) thereafter.  A finding of disability is necessarily a prerequisite for
the award of benefits.  If, as here, a claimant is determined to be not disabled, she
is not entitled to benefits for a closed period or otherwise.

**Conclusion and Recommendation**

For the foregoing reasons, the decision of the Commissioner is supported by
substantial evidence and the correct legal principles were applied.  Therefore, IT IS
RECOMMENDED that the Commissioner's decision finding no disability be
AFFIRMED.   To this extent, Plaintiff's motion for summary judgment (Pleading

---

[16]   A claimant must prove he meets the requirements for disability only as of the date
of the ALJ's decision.  See 42 U.S.C. § 423(b).

no. 10) seeking a reversal of the Commissioner's decision should be DENIED, Defendant's motion for judgment on the pleadings (Pleading no. 12) should be GRANTED, and this action should be DISMISSED with prejudice.

_____
WALLACE W. DIXON
United States Magistrate Judge

Durham, NC
May 26, 2006